***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of Deputy Commissioner Ledford.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before Deputy Commissioner Ledford as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On February 12, 2001 an employment relationship existed between plaintiff and defendant.
3. Defendant-employer, Kmart, is self-insured. Cambridge Integrated Systems is the third-party administrator for defendant on this claim.
4. The date of the plaintiff's injury, which is the subject of this claim, is February 12, 2001.
5. Average weekly wage is to be determined from a Form 22 to be produced by defendant.
6. The following exhibits were stipulated to by the parties at the hearing before Deputy Commissioner Ledford:
a. Stipulated Exhibit 1 — plaintiff's medical records
b. Stipulated Exhibit 2 — Industrial Commission Form 22
 c. Stipulated Exhibit 3 — plaintiff's recorded statement dated May 17, 2001
d. Stipulated Exhibit 4 — plaintiff's employment records
 e. Stipulated Exhibit 5 — Plaintiff's Responses to Defendant's First Set of Interrogatories, including May 6, 2002 Supplementary Responses
7. Plaintiff's Exhibit 1, FMLA Application, was entered into evidence at the hearing before Deputy Commission Ledford.
8. The issues before the Commission are whether plaintiff sustained an injury by accident or an occupational disease which resulted in her rotator cuff shoulder injury, and if so, to what benefits, compensation and medical care is plaintiff entitled.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the hearing before Deputy Commissioner Ledford, plaintiff was 52 years old. She graduated from high school.
2. Plaintiff began working for Kmart at their distribution center in 1992. The distribution center is a warehouse, where plaintiff worked primarily in the "repack department."
3. Plaintiff worked repacking stock from 1992 until late 1998. She operated a machine known as a "stock picker" which she used to pick merchandise from bins on the shelf. Plaintiff testified that the stock picker position involved manual lifting with her arms and that she regularly performed heavy lifting.
4. On November 9, 1998, plaintiff was transferred to the receiving console. Her primary job duties involved using the telephone and CB radios for communicating with the drivers and operating office equipment, such as the printer and copier. She did this job for about a year, and then was out of work due to a hysterectomy.
5. Upon her return to work, plaintiff was assigned to the receiving department, where she had clerical duties, including typing up bills and operating the printer. Along with two other clerical staff, plaintiff was responsible for keeping the printer stocked with paper as needed.
6. The boxes of printer paper weighed around 50 pounds. The printer might need to be restocked once or twice per shift, or less often, depending on the workload.
7. Plaintiff testified that on February 12, 2001, the printer ran out of paper and she went to get another box of paper, and that as she was carrying the box, her hand slipped and the box began to slip from her grasp. Plaintiff caught the box before it hit the floor, and as she did so, she felt a sensation in her shoulder.
8. Plaintiff notified a supervisor, Nate Gidderon, that her shoulder was bothering her. She did not request medical attention.
9. On May 17, 2001, plaintiff gave a recorded statement to Ms. Kimberly Maxfield, an adjuster for Cambridge Integrated Services Group, Inc. When asked about her injury, plaintiff stated that she was getting a box to load paper into the printer and that "I went to pick it up and I felt my arm there was a pull on my arm that felt like it hurt for a minute but then it didn't hurt but a couple of minutes and then it went away and it didn't hurt anymore for a day or two and then every once in a while it got to bothering me and I'd stop my job and rub my shoulder." Plaintiff acknowledged that she first notified her employer that she believed her shoulder problems were work related on May 1, 2001.
10. On February 21, 2001, plaintiff was seen by Dr. Candace Smith at Triad Family Practice Center. She reported "right arm pain since October" and that she worked at the Kmart distribution center and typed at night doing their billing. Plaintiff recalled using a weed eater for several hours in October and thought that might have triggered her symptoms. Plaintiff did not communicate any work related injury as having caused her right arm pain.
11. Plaintiff returned to see Dr. Smith on February 26, 2001 with a cough and was assessed with bronchitis. Dr. Smith took her out of work for bronchitis and plaintiff remained out of work at the direction of Dr. Smith and Dr. Todd M. Gerkin, from February 26, 2001 through April 30, 2001 for the unrelated medical conditions of bronchitis, nausea and gallstones.
12. On April 30, 2001, plaintiff was referred by Dr. Gerkin to see Dr. Robert V. Sypher, an orthopedic specialist, for her right shoulder complaints. Plaintiff presented to Dr. Sypher as a private referral, not a workers' compensation referral.
13. Dr. Sypher first saw plaintiff on April 30, 2001, at which time plaintiff told him she had experienced right shoulder pain for about three months. This is inconsistent with the history given to Dr. Smith, which related that the pain had been going on since October. Dr. Sypher examined plaintiff and assessed a right shoulder impingement. He ordered an MRI of her shoulder, which confirmed this assessment, showing a Type II acromion as well as a rotator cuff tear.
14. Also on April 30, 2001, Dr. Sypher completed an FMLA form at plaintiff's request, stating that she had a right shoulder impingement for which it would be necessary for her to work only intermittently or less than a full schedule for an estimated six months. At his deposition, Dr. Sypher testified that at the time he filled out the FMLA form, he was only aware of a general shoulder problem, that he was under the impression that her work involved repetitive lifting and that plaintiff said working caused her pain. Dr. Sypher further testified that the standards he applies in filling out an FMLA form are not comparable to the standards he applies to an out of work note in a workers' compensation case.
15. Dr. Sypher subsequently learned that plaintiff had been working in an office environment for two years. In a letter to Dr. Gerkin dated May 7, 2001, he wrote, "At the present time, she is working in an office environment and should be able to tolerate this form of work indefinitely."
16. Dr. Sypher believed that plaintiff would benefit from an arthroscopic decompression of her right shoulder, distal clavicle resection, and repair of the rotator cuff. He performed this surgery on August 12, 2001. Following surgery, he referred plaintiff for physical therapy.
17. At her follow-up appointment of September 12, 2001, plaintiff complained of increased pain in her shoulder. Upon examination, Dr. Sypher found that her condition had deteriorated and that she was developing a frozen shoulder. He advised that plaintiff begin active range of motion exercises five days a week and continue using her pain medicines. Dr. Sypher kept plaintiff out of work.
18. Plaintiff continued to complain of pain and stiffness in her shoulder at her follow-up visits. Dr. Sypher determined that she had probably developed post-operative bursitis and adhesions. He treated her with steroid injections and continued therapy and kept her out of work.
19. Due to plaintiff's continuing problems, on February 22, 2002, Dr. Sypher performed additional surgery, a reexamination of the subacromial space and distal clavicle resection. Following this surgery, plaintiff again participated in physical therapy.
20. Dr. Sypher's testimony shows that it is very unlikely that plaintiff's right shoulder condition was the result of a single accident, such as the incident with the box of paper on February 12, 2001. Dr. Sypher testified that it would generally take an accident in the magnitude of a 50-foot fall or a huge amount of force to acutely tear a rotator cuff. Dr. Sypher had no recollection of plaintiff telling him of any single incident which precipitated her shoulder pain.
21. As Dr. Sypher testified, rotator cuff disease is an insidious gradual onset process. Most rotator cuff problems are the result of genetic factors, which may be accelerated in some individuals by years of repetitive lifting, most notably from tabletop to shoulder and overhead. Plaintiff has a type II acromion, which is a genetic factor associated with rotator cuff problems. Dr. Sypher defined repetitive lifting as a rate of 30 times per hour based on the classic definition, but stressed that the key consideration is the combination of force and repetition. He further noted that lifting is not limited to work, but occurs throughout daily life.
22. Prior to his deposition, Dr. Sypher had not seen Dr. Smith's treatment note reciting an onset of a right shoulder problem in October 2000 and that plaintiff had been using a weed eater. However, Dr. Sypher testified that this note was consistent with his own opinion that it is unlikely that the type of shoulder problem plaintiff developed was the result of a single incident. The shoulder impingement and spurring found in plaintiff tends to evolve over a three to five year period.
23. Dr. Sypher testified that he believed that plaintiff made the connection between her work and her shoulder problems sometime after her April 30, 2001 visit. As Dr. Sypher acknowledged in his deposition, an accurate history would be important to his assessment of any cause of plaintiff's shoulder problems. However, he could only rely upon what the patient told him. Plaintiff led Dr. Sypher to believe that her work involved a lot of lifting, which was not accurate at the time. When she first saw Dr. Sypher, plaintiff had been doing clerical work for over two years. This work did not involve repetitive heavy lifting.
24. Dr. Sypher's note of August 1, 2001, states "Her shoulder predicament has clearly been aggravated by repetitive lifting of 50-75 lbs paper as she reports on the job." However, plaintiff's hearing testimony establishes that generally paper only needed to be loaded into the printer one time per shift, maybe less or more depending on the day. Plaintiff was one of three clerks per shift with equal responsibility for maintaining the printer. Even under Dr. Sypher's most liberal definition of repetitive lifting, this does not constitute repetitive lifting associated with shoulder impingement or rotator cuff damage.
25. In his May 7, 2001 letter to Dr. Gerkin, Dr. Sypher stated that: "Her symptoms are consistent with chronic impingement aggravated by her years working on the loading docks at the K-mart Distribution Center. In my judgment this represents an occupationally induced impingement and rotator cuff tear syndrome." However, prior to her transfer to clerical work in November of 1998, plaintiff operated a stock picker in the repack department. Plaintiff's testimony does not show that this job involved repetitive manual lifting. Although at that time plaintiff was responsible for helping out in the warehouse as directed by management, her testimony showed she was never reassigned to the loading docks or any other department for more than one shift or partial shift.
26. The greater weight of the competent evidence fails to establish that plaintiff sustained an injury by accident on or about February 12, 2001, causing the injury to her right shoulder. Even if plaintiff's testimony regarding the box slipping is accepted as credible, the medical evidence fails to show that this incident precipitated her shoulder problems. Dr. Sypher testified and the Commission finds that it was unlikely that the alleged accident on February 12, 2002 caused plaintiff's right shoulder problems.
27. The greater weight of the competent evidence also fails to establish that plaintiff developed an occupational disease as a consequence of her employment, which resulted in her right shoulder impingement or rotator cuff tear. Dr. Sypher's opinion as to the work-relatedness of plaintiff's shoulder condition was based upon inaccurate information concerning the nature of plaintiff's work duties.
28. Even assuming that the job activities contributed to the contraction of the occupational disease, the greater weight of the medical evidence fails to show that plaintiff's job duties exposed plaintiff to an increased risk of developing a rotator cuff tear as compared to the general public not so employed.
29. The greater weight of the evidence shows that the incident on February 12, 2001 was not an injury by accident arising out of and in the course of plaintiff's employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. For an injury to be compensable, it must be shown to have resulted from an accident arising out of and in the course of employment. N.C. Gen. Stat. § 97-2(6); Perry v. Bakeries Co., 262 N.C. 272,136 S.E.2d 643 (1964). Plaintiff failed to carry the burden of proving that the incident on February 12, 2001 was the proximate cause of her rotator cuff injuries. Accordingly, plaintiff has not met her burden of proving by the greater weight of the evidence that she sustained an injury by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat. § 97-2(6); Click v. Freight Carriers,300 N.C. 164, 265 S.E.2d 389 (1980).
2. In order for plaintiff's shoulder injury to constitute a compensable occupational disease, plaintiff must show that the condition was due to causes and conditions characteristic of and peculiar to the particular trade or occupation involved but excluding all ordinary diseases of life to which the general public is equally exposed outside the employment. N.C. Gen. Stat. § 97-53(13); Booker v. MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979).
3. The medical evidence fails to show that plaintiff was at an increased risk of developing her right shoulder conditions as compared to the general public not so employed. Therefore, plaintiff did not contract a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law plaintiff's claim must be, and is hereby, DENIED.
2. Each side shall bear its own costs, except that defendant shall be responsible for the expert witness fee of $500.00 previously approved for Dr. Sypher and the costs of that deposition.
This the ___ day of June 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER